[No. S079744. June 14, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL EARL ANSELL, JR., Defendant and Appellant.

**COUNSEL**

William O'Neill III for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger, Ruth M. Saavedra and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—The Legislature has provided more than one means by which, after the sentence is served, a convicted felon may ask the Governor for a pardon, and may thereby seek release from certain civil disabilities attending the conviction. One such statutory procedure appears in Penal Code section 4852.01 et seq., concerning "certificates of rehabilitation" in the superior court.[1] A convicted felon can request a certificate of rehabilitation, and the superior court may issue such an order, upon a compelling showing of postsentence reform. If granted, the certificate of rehabilitation serves as an automatic application and judicial recommendation for a gubernatorial pardon in the particular case.

Samuel Earl Ansell, Jr., (Ansell) is a convicted child molester who sought a certificate of rehabilitation long after he finished serving his sentence. The superior court denied the petition under a statutory amendment, adopted after Ansell committed his crimes, which makes a certificate of rehabilitation unavailable to persons who, like Ansell, have been convicted of particular sex offenses. The Court of Appeal affirmed. Ansell sought review in this court.

Ansell claims here, as below, that the amendment retroactively increases the punishment for his crimes and therefore violates the prohibition against ex post facto laws under the federal and state Constitutions. However,

---

[1] All further unlabeled statutory references are to the Penal Code.

because a certificate of rehabilitation has no direct or indirect ameliorative effect on the "punishment" for a crime, as that word is defined for ex post facto purposes, a postcrime amendment which restricts the availability of the certificate, and thus relegates offenders like Ansell to other means of seeking a postsentence pardon, does not increase such punishment in violation of the ex post facto clause. We will affirm the judgment of the Court of Appeal.

## I. STATUTORY BACKGROUND

The Penal Code prescribes punishment, of course, for the crimes defined therein. For convicted felons, including sex offenders, such punishment typically involves a prison sentence, although other dispositions such as probation are authorized in some cases. (See, e.g., §§ 1168, 1170, 1203.)[2]

Less known, perhaps, are the collateral consequences associated with a felony conviction after sentence has been served. Most of these disabilities have existed in some form for decades, and many appear in statutes located outside the Penal Code. Some of the more common rules include disqualification from jury service,[3] impeachment as a witness,[4] inaccessibility to

---

[2]In the past, state prisoners also received statutory sanctions loosely based on the ancient common law doctrine of "civil death." These statutes existed in California from at least 1850 through 1975, and were renumbered and revised to some extent during that time. (See, e.g., former § 2600 et seq., added by Stats. 1941, ch. 106, § 15, p. 1091, and repealed by Stats. 1975, ch. 1175, § 2, p. 2897.) Depending upon the convict's sentence, such statutes eliminated or restricted, during imprisonment and any parole, various rights and privileges enjoyed by other citizens, including the ability to contract, marry, inherit, and participate in judicial proceedings. (Scott, *Civil Death in California: A Concept Overdue for its Grave* (1975) 15 Santa Clara L.Rev. 427, 431-433; Comment, *Convicts—Loss of Civil Rights—Civil Death in California* (1953) 26 So.Cal. L.Rev. 425, 427-432.) The civil death statutes were eventually replaced by different statutory language allowing prisoners to be deprived during their confinement of "such rights, and only such rights, as is [*sic*] reasonably related to legitimate penological interests." (§ 2600, added by Stats. 1975, ch. 1175, § 3, p. 2897, and amended by Stats. 1994, ch. 555, § 1, p. 2821.) Because we address the certificate of rehabilitation scheme in section 4852.01 et seq., and its effect on convicted felons whose sentences are complete, neither the original civil death statutes nor their successors have direct application here.

[3](Code Civ. Proc., § 203, subd. (a)(5) [stating that persons "convicted of malfeasance in office or a felony" are not "eligible and qualified to be prospective trial jurors"]; Pen. Code, § 893, subd. (b)(3) [stating that anyone who has been "convicted of malfeasance in office or any felony or other high crime" is "not competent to act as a grand juror"]; see Cal. Const., art. VII, § 8, subd. (b) [authorizing legislation "to exclude persons convicted of bribery, perjury, forgery, malfeasance in office, or other high crimes from . . . serving on juries"].)

[4](Evid. Code, § 788 [allowing the "credibility of a witness" in a civil or criminal proceeding to be "attack[ed]" by evidence that he has been "convicted of a felony"]; see Cal. Const., art. I, § 28, subd. (f), added by voter initiative June 8, 1982, commonly known as Prop. 8

firearms,[5] and registration as a sex offender.[6] In addition, a felony conviction may disqualify the person from practicing many licensed trades and professions and from holding certain positions of public employment.[7] Under prior law, persons convicted of "infamous crimes" were disenfranchised even after sentence was complete.[8] However, a convicted felon who is not imprisoned or on parole can now vote.[9]

As explained further below, convicted felons who claim to be reformed have traditionally sought relief from the various consequences of their convictions through the Governor's power and discretion to grant pardons under the state Constitution. (*People v. Biggs* (1937) 9 Cal.2d 508, 511 [71

---

[requiring use of "[a]ny prior felony conviction . . . without limitation for purposes of impeachment . . . in any criminal proceeding"].)

[5](§ 12021, subd. (a)(1) [imposing criminal liability upon any person who has been "convicted of a felony" and who "owns" or has "possession[,] custody or control" of "any firearm"].)

[6](§ 290, subds. (a)(1)(A) [requiring any person convicted of specified sex offenses to "register" for "life" with specified law enforcement agencies in the person's area of residence], (g)(2) [imposing criminal liability upon convicted felons who "willfully" violate the registration requirement].)

[7](E.g., Bus. & Prof. Code, §§ 480, subd. (a)(1) [authorizing denial of any license regulated by this code where the applicant has been "convicted of a crime" that is "substantially related to the qualifications, functions or duties of the business or profession for which application is made"], 490 [authorizing suspension or revocation of a license where the licensee has been "convicted of a crime [that] is substantially related to the qualifications, functions, or duties of the business or profession for which the license was issued"]; see Gov. Code, §§ 1029, subd. (a)(1) [stating that any person who has been "convicted of a felony" is "disqualified from holding office as a peace officer"], 18935, subd. (f) [stating that any person who has been "convicted of a felony" may be ineligible for examination or appointment in the state civil service system].)

[8](Cal. Const., former art. II, § 1, adopted 1879 and repealed Nov. 7, 1972 [prohibiting any person "convicted of any infamous crime" from "ever exercis[ing] the privileges of an elector in this State"]; Cal. Const. of 1849, art. II, § 5 [stating no person "convicted of any infamous crime" shall be "entitled to the privileges of an elector"]; see *Truchon v. Toomey* (1953) 116 Cal.App.2d 736, 738 [254 P.2d 638, 36 A.L.R.2d 1230] [classifying all felonies as "infamous crimes" for disenfranchisement purposes]; cf. *Otsuka v. Hite* (1966) 64 Cal.2d 596, 605-611 [51 Cal.Rptr. 284, 414 P.2d 412] [holding that only convictions for crimes involving dishonesty and moral corruption are "infamous" and warrant disenfranchisement]; but see *Ramirez v. Brown* (1973) 9 Cal.3d 199, 211-217 [107 Cal.Rptr. 137, 507 P.2d 1345] [holding that state constitutional and statutory provisions disenfranchising convicted felons who are no longer in prison or on parole violate federal equal protection principles], revd. *sub nom.* *Richardson v. Ramirez* (1974) 418 U.S. 24, 41-56 [94 S.Ct. 2655, 2665-2671, 41 L.Ed.2d 551] [finding no federal equal protection violation].)

[9](Elec. Code, §§ 2150, subd. (a)(9) [requiring voter to declare upon registration that he is "currently not imprisoned or on parole for the conviction of a felony"], 2201, subd. (c) [directing election officials to cancel the registration of voters who are "presently imprisoned or on parole for conviction of a felony"]; see Cal. Const., art. II, § 4 [authorizing legislation to "provide for the disqualification of electors while . . . imprisoned or on parole for the conviction of a felony"].)

P.2d 214, 116 A.L.R. 205].)[10] Different pardon application procedures exist in two neighboring statutory schemes. Since both schemes affect our analysis and appear in few published decisions, we summarize them as follows.

The oldest procedure—the one not invoked by Ansell—is located in section 4800 et seq. As pertinent here, this scheme authorizes the submission of pardon applications directly to the Governor. Such direct applications are investigated and processed as set forth in the margin.[11]

Ansell relies on the certificate of rehabilitation procedure in section 4852.01 et seq., which, by its own terms, offers an "additional, but not an exclusive" means of requesting a pardon. (§ 4852.19.) During World War II the Governor's office was inundated with pardon applications received from ex-felons who were otherwise barred from serving in the military and working in defense industries. (See *Requirement for Rehabilitation Certificate, supra*, 65 Ops.Cal.Atty.Gen. 232, 233-234; Mosk, *Certificates of Rehabilitation and the New Pardon Procedure* (1943) 18 State Bar J. 172, 173-175.) Enacted as an urgency measure in 1943, the certificate of rehabilitation

---

[10]The clemency powers of the chief executive are described in article V, section 8, subdivision (a) of the California Constitution, as follows: "*Subject to application procedures provided by statute*, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring." (Italics added.) Adopted in 1966, the foregoing provision is based on similar provisions that have appeared in the state Constitution since 1849. (See Cal. Const., former art. VII, § 1, adopted 1879 and repealed Nov. 8, 1966; see also Cal. Const. of 1849, art. V, § 13.)

[11]The pardon application scheme appearing in section 4800 et seq. was enacted in 1941, and can be traced to statutes in existence long before that time. (See *Requirement for Rehabilitation Certificate,* 65 Ops.Cal.Atty.Gen. 232, 233 (1982).) Under these provisions, pardon applications are submitted directly to the Governor (§§ 4802, 4803), and then transmitted to the Board of Prison Terms for investigation and a recommendation (§§ 4802, 4812, 4813). To ensure a "full and complete" inquiry, the Board of Prison Terms examines the application and any related materials, and may consider witness testimony. (§ 4812.) To the same end, either the Governor or the Board of Prison Terms may solicit a report and recommendation from the trial judge or the district attorney who participated in criminal proceedings involving the pardon applicant. (§ 4803.) As noted earlier, article V, section 8, subdivision (a) of the state Constitution precludes a pardon for persons "twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring." Hence, once the pardon application of a twice-convicted felon is received by the Governor and investigated by the Board of Prison Terms, special statutes govern its transmission between the executive branch and the Supreme Court. (§§ 4850-4852; see *People v. Hart* (1999) 20 Cal.4th 546, 656, fn. 44 [85 Cal.Rptr.2d 132, 976 P.2d 683] [defendant is "twice convicted" where his "current offense is a felony and [he] has [at least] one prior felony conviction"]; *Green v. Superior Court* (1934) 2 Cal.2d 1, 2-3 [37 P.2d 694] [defendant is not "twice convicted" where he was convicted of two felonies charged and tried in the same proceeding].)

scheme eased the administrative burden on the executive branch by allowing the superior court to investigate and recommend pardon applicants. (Stats. 1943, ch. 400, § 1, p. 1922, eff. May 13, 1943.)

With certain exceptions discussed as relevant below, the certificate of rehabilitation procedure is available to convicted felons who have successfully completed their sentences, and who have undergone an additional and sustained "period of rehabilitation" in California. (§ 4852.03, subd. (a) [imposing general minimum requirement of five years' residence in this state, plus an additional period typically ranging between two and five years depending upon the conviction]; see §§ 4852.01, subds. (a)-(c), 4852.06.) During the period of rehabilitation, the person must display good moral character, and must behave in an honest, industrious, and law-abiding manner. (§ 4852.05; see § 4852.06.) Several provisions make clear that a person is "ineligible to . . . petition for a certificate of rehabilitation" (§ 4852.03, subd. (b)), and that no such petition "shall be filed" (§ 4852.06), unless and until the foregoing requirements are met. (See § 4852.01, subds. (a)-(c) [describing who "may file" a petition].)

Proceedings begin when a qualified person petitions for a certificate of rehabilitation in the superior court of the county in which he lives. (§ 4852.06; see § 4852.07 [requiring notice to the Governor and to the district attorney in the county or counties where the petition is filed and the petitioner was convicted].) Other provisions allow the petitioner to pursue a certificate of rehabilitation without personal expense and with professional assistance. (§§ 4852.04 [establishing a right to counsel and to assistance from rehabilitative agencies, including probation and parole officers], 4852.08 [authorizing representation by the public defender or other appointed counsel], 4852.09 [prohibiting court fees of any kind], 4852.1 [authorizing the production of official records at no charge], 4852.18 [making the petition and other necessary forms available at no charge].)

The superior court holds a hearing and considers testimonial and documentary evidence bearing on the petition. (§§ 4852.1, 4852.11.) To this end, the court may compel the production of judicial, correctional, and law enforcement records concerning the crimes of which petitioner was convicted, his performance in custody and on supervised release, and his conduct during the period of rehabilitation, including all violations of the law known to any peace officer. (*Ibid.*) The district attorney may be directed to investigate and report on relevant matters. (§ 4852.12.)

To enter an order known as a certificate of rehabilitation, the superior court must find that the petitioner is both rehabilitated and fit to exercise the

rights and privileges lost by reason of his conviction. (§ 4852.13, subd. (a).)[12] The issuing court transmits certified copies of the certificate of rehabilitation to the Governor, the Board of Prison Terms, the Department of Justice, and—in the case of persons twice convicted of a felony—the Supreme Court. (§ 4852.14.)

A certificate of rehabilitation issued and transmitted in the foregoing manner serves two functions under the language of the statutory scheme. First, it has the effect of "recommending that the Governor grant a full pardon to the petitioner." (§ 4852.13(a).) Second, the certificate of rehabilitation constitutes "an application for a full pardon upon receipt of which the Governor may, without any further investigation, issue a pardon to the person named therein, except that, pursuant to Section 8 of Article V of the Constitution, the Governor shall not grant a pardon to any person twice convicted of felony, except upon the written recommendation of a majority of the judges of the Supreme Court." (§ 4852.16.)

Whether a certificate of rehabilitation and automatic application for a pardon issues under section 4852.01 et seq., or whether a pardon is sought by direct application under section 4800 et seq., certain civil rights and privileges are restored if the Governor acts favorably on the request.[13] General statements of this ameliorative principle appear in section 4852.17, concerning "a full and unconditional pardon by the Governor, based upon a

---

[12]Section 4852.13, subdivision (a) (section 4852.13(a)) states: "[I]f after hearing, the court finds that the petitioner has demonstrated by his or her course of conduct his or her rehabilitation and his or her fitness to exercise all of the civil and political rights of citizenship, the court may make an order declaring that the petitioner has been rehabilitated, and recommending that the Governor grant a full pardon to the petitioner. This order shall be filed with the clerk of the court, and shall be known as a certificate of rehabilitation." By way of contrast, the Legislature recently added language to the same statute identifying at least one circumstance under which convicted sex offenders cannot obtain relief: "No certificate of rehabilitation shall be granted to a person convicted of any offense specified in Section 290[, the sex offender registration statute,] if the court determines that the petitioner presents a continuing threat to minors of committing any of the offenses specified in Section 290." (§ 4852.13, subd. (b), added by Stats. 1996, ch. 981, § 6 (section 4852.13(b)).) Another provision has long provided that the court "may deny" a certificate of rehabilitation for any "violations of law" committed during the period of rehabilitation. (§ 4852.11.)

[13]Nothing in either pardon application scheme authorizes the removal of a conviction from a felon's criminal record or the sealing of a record of conviction. Rather, the fact that a certificate of rehabilitation has issued or a pardon has been granted "shall be immediately reported to the Department of Justice by the court, Governor, officer, or governmental agency by whose official action the certificate is issued or the pardon granted. The Department of Justice shall immediately record the facts so reported on the former criminal record of the person, and transmit those facts to the Federal Bureau of Investigation at Washington, D.C. When the criminal record is thereafter reported by the department, it shall also report the fact that the person has received a certificate of rehabilitation, or pardon, or both." (§ 4852.17.)

certificate of rehabilitation,"[14] and in section 4853, concerning all other cases "in which a full pardon has been granted by the Governor."[15]

More specific statutes in various codes and schemes confirm that a pardon removes or alleviates particular disabilities, including those cited earlier in the opinion.[16] With respect to some disabilities, relief may be available based on the convicted felon's receipt of a certificate of rehabilitation, even where no pardon has been obtained.[17]

Recently, the Legislature limited the circumstances under which a certificate of rehabilitation can be sought and obtained by convicted sex offenders,

---

[14]Section 4852.17 states, in pertinent part, "Whenever a person is granted a full and unconditional pardon by the Governor, based upon a certificate of rehabilitation, the pardon shall entitle the person to exercise thereafter all civil and political rights of citizenship, including but not limited to: (1) the right to vote; (2) the right to own, possess, and keep any type of firearm that may lawfully be owned and possessed by other citizens; except that this right shall not be restored, and Sections 12001 and 12021 shall apply, if the person was ever convicted of a felony involving the use of a dangerous weapon."

[15]Section 4853 states, in pertinent part, "In all cases in which a full pardon has been granted by the Governor of this state or will hereafter be granted by the Governor to a person convicted of an offense to which the pardon applies, it shall operate to restore to the convicted person, all the rights, privileges, and franchises of which he or she has been deprived in consequence of that conviction or by reason of any matter involved therein."

[16]For example, under the Code of Civil Procedure, convicted felons are eligible to serve on trial juries if their "civil rights" have "been restored." (*Id.*, § 203, subd. (a)(5).) Under Evidence Code section 788, impeachment with a felony conviction is barred if the witness has obtained either a "pardon based on his innocence" (*id.*, subd. (a)), or a "certificate of rehabilitation and pardon" (*id.*, subd. (b)). Likewise, a "pardon . . . based upon a certificate of rehabilitation" restores "the right to own, possess, and keep any type of [lawful] firearm," except where "the person was ever convicted of a felony involving the use of a dangerous weapon." (Pen. Code, § 4852.17; see *id.*, § 4854 [establishing similar firearm rule in *any* case in which the Governor "grant[s] a pardon"].) Under a recent amendment to Penal Code section 290.5, persons convicted of committing certain serious sex crimes against children and adults can no longer use a certificate of rehabilitation to remove the duty to register under section 290; such duty does not end "until that person has obtained a full pardon" by proceeding either under Penal Code section 4800 et seq. or under section 4852.01 et seq. (*Id.*, § 290.5, subd. (b)(1), as amended by Stats. 1996, ch. 129, § 1.) Finally, a pardon may enhance certain employment and professional opportunities otherwise unavailable to convicted felons. (E.g., Gov. Code, § 1029, subd. (b) [allowing convicted felons to work as parole or probation officers where "a full and unconditional pardon" has been obtained]; but see Pen. Code, §§ 4852.15 [cautioning that a certificate of rehabilitation does not compel reinstatement of any license, permit, or certificate needed "to practice or carry on any profession or occupation," including the practice of medicine or law], 4853 [establishing similar cautionary rule where a pardon has been granted].)

[17](E.g., Bus. & Prof. Code, § 480, subd. (b) [stating that no license to practice a profession or vocation regulated by this code shall be denied "solely on the basis" of a felony conviction where the applicant "has obtained a certificate of rehabilitation" under Penal Code section 4852.01 et seq.]; Pen. Code, § 290.5, subd. (a) [relieving persons convicted of less serious sex crimes of the duty to register under § 290 if they have "obtain[ed] a certificate of rehabilitation" and are "not in custody, on parole, or on probation"].)

particularly child molesters. Critical here is section 4852.01, subdivision (d). Effective January 1, 1998, this provision states, "Th[e] chapter [beginning with section 4852.01 and establishing the certificate of rehabilitation procedure] shall not apply to . . . persons convicted of a violation of subdivision (c) of Section 286 [sodomy with a victim under age 14 or by force, fear, or retaliatory threat], Section 288 [lewd acts with a victim under age 14], subdivision (c) of Section 288a [oral copulation with a victim under age 14 or by force, fear, or retaliatory threat], Section 288.5 [continuous sexual abuse of a victim under age 14], or subdivision (j) of Section 289 [sexual penetration with a victim under age 14] . . . ." (§ 4852.01, subd. (d), as amended by Stats. 1997, ch. 61, § 2 (section 4852.01(d), the amended statute, or the amendment).)[18]

## II. PROCEDURAL BACKGROUND

Ansell, acting through counsel, filed a petition for a certificate of rehabilitation (petition) in Sacramento County Superior Court (trial court) on January 22, 1998. The District Attorney of Sacramento County (district attorney) conducted a preliminary investigation and reported its findings to the trial court (report). The sparse record in the present case consists largely of these two documents and attachments, and reveals the following facts.

Ansell sustained three felony convictions in Orange County on December 29, 1980. Violations of three different statutes were involved—section 288, subdivision (a) (lewd conduct with a victim under age 14), section 288a, subdivision (b)(2) (oral copulation with a victim under age 16), and section

---

[18]When section 4852.01(d) was amended in 1997, subdivision (e) was added to the statute at the same time (section 4852.01(e)). (Stats. 1997, ch. 61, § 2.) Section 4852.01(e) states, "Notwithstanding the above provisions or any other provision of law, the Governor shall have the right to pardon a person convicted of [the sex crimes specified in section 4852.01(d)] if there are extraordinary circumstances." The legislative history reveals that in enacting section 4852.01(e), lawmakers assumed or found the following facts: (1) persons convicted of the sex crimes listed in section 4852.01(d) have received pardons only in rare and extraordinary cases, (2) sex offenders convicted of these crimes would continue seeking pardons directly from the Governor even after section 4852.01(d) was amended to prevent use of certificates of rehabilitation for this purpose, and (3) nothing in the amendment to section 4852.01(d) affects the manner in which the Governor exercises his constitutional power to pardon persons convicted of the specified crimes. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as introduced Feb. 26, 1997, p. 4 [observing that the Governor had pardoned no convicted child molesters in several years]; Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as amended May 5, 1997, p. 1 [clarifying that under § 4852.01(e), the Governor "retains" authority to receive and grant pardon requests from convicted sex offenders notwithstanding the amendment to § 4852.01(d)].) In short, section 4852.01(e) was apparently intended to reaffirm—not to somehow restrict—both the ability of convicted sex offenders to request pardons directly from the Governor, and the authority of the Governor to act on those applications, after the amendment to section 4852.01(d) took effect.

288a, subdivision (c) (oral copulation with a victim under age 14 or by use of force, fear, or retaliatory threat). Ansell was committed to Patton State Hospital, having apparently qualified as a "mentally disordered sex offender" under former law. (See Welf. & Inst. Code, former § 6300 et seq., repealed by Stats. 1981, ch. 928, § 2, p. 3485.) When Ansell was released on September 2, 1983, his sentence was modified to five years' probation, and included a requirement that he register as a convicted sex offender under section 290.

The petition alleged, and the report did not dispute, that Ansell had lived continuously in California since April 1984, had successfully completed probation in September 1988, and had behaved in an upright fashion throughout the period of rehabilitation. Attached to the petition and incorporated therein was an order of the Orange County Superior Court, filed September 12, 1997, granting Ansell relief from the 1980 convictions under section 1203.4, subdivision (a) (section 1203.4(a)). Specifically, the section 1203.4(a) order vacated the guilt judgment, dismissed the underlying complaint, and purported to release Ansell from "penalties and disabilities" resulting from his convictions. However, the same order made clear that it did not permit access to firearms (see §§ 1203.4(a), 12021), remove the obligation to register as a sex offender (see §§ 290.1, 290.5), or preclude disclosure of the conviction on applications for public office or license (see § 1203.4(a)).[19]

---

[19]Section 1203.4(a) applies by its terms to convicted felons or misdemeanants who have successfully completed probation and who are not serving a criminal sentence or charged with any crime. Under this procedure, the defendant "withdraw[s]" his plea of guilty or nolo contendere and enters a plea of not guilty, or the court "set[s] aside" the conviction entered following a not guilty plea. (*Ibid.*) In either case, the accusatory pleading is "dismiss[ed]," and the defendant is "released from all penalties and disabilities resulting from the offense of which he or she has been convicted." (*Ibid.*)

As suggested by the qualified terms of the order granting such relief to Ansell, the "penalties and disabilities" affected by section 1203.4(a) have been carefully defined and limited under relevant statutory and decisional law. (See *Meyer v. Board of Medical Examiners* (1949) 34 Cal.2d 62, 67 [206 P.2d 1085] [holding that § 1203.4(a) does not bar use of the underlying conviction in professional disciplinary proceedings, and noting that the statute is "so qualified in its application [as to not] obliterate the record of conviction" for most purposes]; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 603, pp. 799-802 [indicating that § 1203.4(a) has no ameliorative effect on most statutory disabilities arising from a felony conviction].) Insofar as it applies to convicted felons who have completed probation and meet all other requirements, the certificate of rehabilitation scheme assumes "the accusatory pleading . . . has been dismissed pursuant to Section 1203.4." (§ 4852.01, subd. (c).)

However, when section 4852.01(d) was amended to prevent sex offenders like Ansell from seeking certificates of rehabilitation, the same legislation inserted similar disqualifying language into section 1203.4. (*Id.*, subd. (b), as amended by Stats. 1997, ch. 61, § 1 (section 1203.4(b)) [stating that "[s]ubdivision (a) of this section does not apply . . . to any violation

A hearing on the petition was held April 22, 1998. The district attorney argued that the amendment to section 4852.01(d)—which took effect shortly before the petition was filed—prevented Ansell from receiving a certificate of rehabilitation based on his convictions under section 288, subdivision (a), and section 288a, subdivision (c). Citing new section 4852.01(e) and alluding to section 4800 et seq., the district attorney observed that any relief from these convictions was available only through a pardon obtained directly from the Governor. Counsel for Ansell replied that denying the petition based on legislation enacted long after the crimes violated ex post facto principles. Ruling from the bench, the trial court summarily rejected the ex post facto claim and denied the petition.

Ansell appealed, and the judgment was affirmed. In a brief opinion, the Court of Appeal concluded that because Ansell was not foreclosed from seeking a pardon altogether, section 4852.01(d) did not retroactively inflict new punishment for his crimes or otherwise implicate ex post facto concerns. The court declined to follow *Sovereign v. People* (1983) 144 Cal.App.3d 143 [192 Cal.Rptr. 469] (*Sovereign*) insofar as it invalidated, on ex post facto grounds, another unfavorable postcrime change in the certificate of rehabilitation procedure. We granted Ansell's petition for review.

## III. DISCUSSION

### A. *The Amended Statute Applies by Its Terms Here.*

■■■ The parties seem to assume that amended section 4852.01(d) applies to persons seeking a certificate of rehabilitation after January 1, 1998, the amendment's effective date, if they were convicted of a specified sex crime *at any time.* Under such a construction, the certificate is unavailable to the petitioner even though he committed his crimes and allegedly reformed before the amended statute took effect. We agree the Legislature intended this result.

In preventing some convicted sex offenders from invoking the certificate of rehabilitation scheme, section 4852.01(d) does not state that the underlying crime must occur, or that a conviction must be entered, *after* January 1, 1998. Nor does the amendment purport to exempt from its operation individuals who were eligible to pursue a certificate of rehabilitation *before* that time, but who failed to do so.

---

of subdivision (c) of Section 286, Section 288, subdivision (c) of Section 288a, Section 288.5, or subdivision (j) of Section 289"]; see also Stats. 2000, ch. 226, § 1, eff. Aug. 28, 2000 [adding language to § 1203.4(b) concerning "any felony conviction pursuant to subdivision (d) of Section 261.5"].) As noted above in the text, these statutory changes occurred *after* Ansell received relief under section 1203.4(a), and *before* he unsuccessfully sought a certificate of rehabilitation in the trial court.

Rather, the amendment declares that the certificate of rehabilitation procedure in section 4852.01 et seq. "shall not apply" to "persons convicted of" violating particular sex crime statutes. (§ 4852.01(d).) This language is unqualified, and its meaning is plain. No one who has ever been convicted of a specified offense can use the statutory scheme to request or receive a certificate of rehabilitation with the amended statute in effect. To hold that the amendment does not apply based on the age of the underlying crimes or for some other reason, we would have to engraft onto section 4852.01(d) exceptions and limitations that find no support in its literal terms. We decline to rewrite the statute or to artificially restrict its scope.

The legislative history supports our determination that the amended statute applies under the circumstances of the present case. These materials disclose several reasons for the amendment, and suggest an intent to immediately affect the broadest possible range of cases.[20]

First, based on the "high recidivism rate," persons convicted of the sex crimes listed in section 4852.01(d) were deemed to be a threat to the public long after their crimes are committed and any sentence is served. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as introduced Feb. 26, 1997, pp. 1, 3.) The Legislature doubted that rehabilitation could be "verifi[ed]" in such cases; it assumed a risk of reoffense exists even where a judicial finding of reform is made, and feared the public might be lulled into a false sense of security under such circumstances. (*Id.* at p. 3.) The Legislature determined that the public is best protected by denying potential recidivists access to certificates of rehabilitation altogether. (*Ibid.*)

Next, the Legislature found that even before section 4852.01(d) was amended, convicted sex offenders received "no practical benefit" under the statutory scheme. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as amended May 5, 1997, p. 3.) Information from the Governor's Office revealed that pardons based on certificates of rehabilitation are rare for persons convicted of the sex crimes listed in

---

[20]We grant the Attorney General's request for judicial notice of certain legislative committee reports underlying enactment of section 4852.01(d), and cited above in the text. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see, e.g., *People v. Jones* (2001) 25 Cal.4th 98, 106, fn. 3 [104 Cal.Rptr.2d 753, 18 P.3d 674]; *People v. Epps* (2001) 25 Cal.4th 19, 24, fn. 2 [104 Cal.Rptr.2d 572, 18 P.3d 2].) As noted earlier, both section 4852.01(d) and section 1203.4(b) were amended at the same time to prevent persons convicted of particular sex crimes from seeking certificates of rehabilitation and dismissals of the accusatory pleading, respectively. (See *ante,* fn. 19.) Similar reasoning prompted each statutory change, and both provisions are discussed interchangeably in the joint legislative history.

section 4852.01(d). (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as introduced Feb. 26, 1997, p. 4.) The Legislature also predicted that fewer convicted sex offenders would seek or obtain certificates of rehabilitation in light of two then recent changes in other statutes. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as amended May 5, 1997, p. 3.) Such changes were identified (*ibid.*), as follows: (1) the amendment of section 290.5, which ended the ability of many sex offenders—including those covered by section 4852.01(d)—to use a certificate of rehabilitation to remove the duty to register under section 290 (see *ante*, fn. 16), and (2) the enactment of section 4852.13(b), which prevents certificates of rehabilitation from being granted to sex offenders who remain a threat to minors (see *ante*, fn. 12).

Finally, the Legislature sought to avoid the "waste of public resources" that would occur if certificates of rehabilitation were routinely requested and denied in sex offense cases. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as amended May 5, 1997, pp. 3, 5.) Lawmakers were keenly aware of provisions in section 4852.01 et seq. allowing petitioners to seek certificates of rehabilitation at public expense, obligating public agencies to investigate and litigate those petitions, and compelling the superior court to hold hearings in such cases. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) as introduced Feb. 26, 1997, pp. 3-4.) Section 4852.01(d) sought to reduce the "burdensome" effect of these provisions by barring requests for certificates of rehabilitation that have little or no chance of success. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 729 (1997-1998 Reg. Sess.) at p. 3.)

In light of the foregoing concerns, the Legislature must have intended to bar persons convicted of the targeted sex crimes from receiving certificates of rehabilitation under section 4852.01(d) as soon as it took effect. A contrary construction would prolong the risk to the public of granting such certificates to convicted sex offenders who had not genuinely reformed, and would postpone the cost-saving benefits which the measure was expected to produce. For instance, if section 4852.01(d) were found to apply only to qualifying sex crimes committed after its January 1, 1998, effective date, the statute would have no effect until the perpetrator of a post-1997 crime had been convicted, served his sentence, completed a lengthy period of rehabilitation, and sought relief under the statutory scheme. Such a construction would effectively delay implementation of the statute for many years after

its enactment. ██ ██ ██ We cannot conceive the Legislature intended to postpone and frustrate section 4852.01(d)'s aims in this manner.[21]

██ Consistent with the parties' apparent understanding of the amended statute, we conclude section 4852.01(d) applies to Ansell based on his 1980 convictions under section 288, subdivision (a), and section 288a, subdivision (c). His request for a certificate of rehabilitation was properly denied unless the amendment is unconstitutional—an issue we now address.

## B. *The Amended Statute Does Not Trigger or Deny Ex Post Facto Protection.*

██ Ansell emphasizes that section 4852.01(d) eliminates the certificate of rehabilitation procedure based on crimes committed before the statute was amended. He insists this unfavorable change in the statutory effect of past criminal conduct violates the ex post facto clauses of both the federal and state Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; see *People v. Frazer* (1999) 21 Cal.4th 737, 754, fn. 15 [88 Cal.Rptr.2d 312, 982 P.2d 180], and cases cited [placing no different meaning on the federal and state ex post facto clauses, and following United States Supreme Court cases on the subject].)

██ Beginning with *Collins v. Youngblood* (1990) 497 U.S. 37, 41-44 [110 S.Ct. 2715, 2718, 2720, 111 L.Ed.2d 30] (*Collins*), the United States Supreme Court has reaffirmed that the ex post facto clause is interpreted in a manner consistent with its understanding when the Constitution was framed. (Accord, *Carmell v. Texas* (2000) 529 U.S. 513, 521-525 [120 S.Ct. 1620, 1626-1629, 146 L.Ed.2d 577] (*Carmell*).) This approach employs the test announced in *Calder v. Bull* (1798) 3 U.S. (3 Dall.) 386, 390 (opn. of Chase, J.) (*Calder*), and defines ex post facto violations in terms of four

---

[21]Section 3 states, "No part of [the Penal Code] is retroactive, unless expressly so declared." Although the statute speaks in terms of an "express[ ]" legislative declaration, case law makes clear that section 3 is satisfied, and "retroactive" application may be found, where there is " 'a clear and compelling *implication*' " that the Legislature intended such a result. (*People v. Grant* (1999) 20 Cal.4th 150, 157 [83 Cal.Rptr.2d 295, 973 P.2d 72], quoting *People v. Hayes* (1989) 49 Cal.3d 1260, 1274 [265 Cal.Rptr. 132, 783 P.2d 719], italics added.) We may assume that, insofar as section 4852.01(d) bases ineligibility for a certificate of rehabilitation on pre-1998 crimes, section 4852.01(d) is "retroactive" within the meaning of section 3, because all the events triggering section 4852.01(d)'s application would have occurred before that statute's effective date. (*People v. Grant, supra,* 20 Cal.4th at p. 157.) However, for reasons discussed at length above, the language and history of section 4852.01(d) provide the necessary " 'clear and compelling implication' " that the statute was intended to apply in this manner. (*People v. Grant, supra,* 20 Cal.4th at p. 157.)

finite groups.[22] While more expansive and amorphous formulations had developed after *Calder* was decided, they have since been disavowed.

In particular, the high court has made clear that an ex post facto violation does not occur simply because a criminal defendant loses " 'substantial protections' " (*Collins, supra*, 497 U.S. 37, 45, 46 [110 S.Ct. 2715, 2721]), or suffers some " 'disadvantage' " after the crime occurs. (*Id.* at pp. 47, 48, 49, 50, 51 [110 S.Ct. at pp. 2721-2723]; accord, *Carmell, supra*, 529 U.S. 513, 539 [120 S.Ct. 1620, 1636]; *Garner v. Jones* (2000) 529 U.S. 244, 255 [120 S.Ct. 1362, 1370, 146 L.Ed.2d 236]; *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506-507, fn. 3 [115 S.Ct. 1597, 1602, 131 L.Ed.2d 588].) As relevant here, and consistent with *Calder*'s third category (see *ante*, fn. 22), a substantial and disadvantageous change is prohibited only if it "inflicts a greater *punishment*, than the law annexed to the crime, when committed." (*Calder, supra*, 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648, 650] (opn. of Chase, J.), italics added.) Unless the consequences are penal in nature, defendants cannot rely on statutes in existence at the time of the crime, or otherwise complain of oppressive retroactive treatment. (*Carmell, supra*, 529 U.S. 513, 532-533 [120 S.Ct. 1620, 1633]; *Lynce v. Mathis* (1997) 519 U.S. 433, 441 [117 S.Ct. 891, 895-896, 137 L.Ed.2d 63].)

Ansell insists that the amendment to section 4852.01(d) "repunishes" all convicted sex offenders to whom it applies. We disagree.

The Legislature's own assessment of the challenged law affects its constitutional character. In finding no punishment for ex post facto purposes, both the United States Supreme Court and this court "ordinarily defer" to legislative assurances that the statute serves nonpunitive governmental aims. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 361 [117 S.Ct. 2072, 2081-2082, 138 L.Ed.2d 501] (*Hendricks*); accord, *Seling v. Young* (2001) 531 U.S. 250, 261 [121 S.Ct. 727, 734, 148 L.Ed.2d 734] (*Young*); *Flemming v. Nestor* (1960) 363 U.S. 603, 617 [80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435] (*Nestor*); *People v. Castellanos* (1999) 21 Cal.4th 785, 795 [88 Cal.Rptr.2d 346, 982 P.2d 211] (*Castellanos*) (lead opn. of George, C. J.); *id.* at p. 801 (conc. & dis. opn. of Kennard, J.); *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171-1172 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).)

---

[22]Under *Calder*, the ex post facto clause protects against limited forms of retroactive criminal legislation, as follows: "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." (*Calder, supra*, 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648, 650] (opn. of Chase, J.).)

 Notwithstanding Ansell's bare assertion to the contrary, such evidence exists here. The challenged provision is part of a statutory scheme that formally recognizes and, to some extent rewards, the rehabilitative efforts of convicted criminals after their sentence is complete. In weighing the costs and benefits of retaining this procedure for certain serious sex offenders, the Legislature expressed no interest in imposing new criminal sanctions or exacting fresh revenge. Nor did it suggest that punishment under existing laws was inadequate. (Cf. *People v. Hanson* (2000) 23 Cal.4th 355, 362 [97 Cal.Rptr.2d 58, 1 P.3d 650] [finding that a restitution fine constitutes punishment for double jeopardy purposes based on an express legislative intent to increase the " 'penalty' " for convicted criminals and dissuade " 'future criminality' "].)

As we have seen, more mundane concerns prompted the amendment of section 4852.01(d). The Legislature found that persons covered by the amended statute are not likely to receive certificates of rehabilitation, given their risk of reoffense. Yet, the cost of financing and litigating unsuccessful petitions in these cases was known to be high. While the Legislature assumed the relevant group remains dangerous even where a certificate of rehabilitation is obtained, such concerns do not compel a finding of punitive intent. (*Hendricks, supra*, 521 U.S. 346, 361 [117 S.Ct. 2072, 2082] [finding no intent to punish sexual predators under an involuntary commitment scheme that "protect[s] the public from harm"]; *Castellanos, supra*, 21 Cal.4th 785, 798 (lead opn. of George, C. J.) [describing as "regulatory," not punitive, a sex offender registration requirement aimed at controlling crime and preventing recidivism]; *Hubbart, supra*, 19 Cal.4th 1138, 1171 [legislative concern over "the serious harm" caused by dangerous sex offenders does not reflect a punitive intent].)

 Of course, a measure can be "so punitive in either purpose or effect" that it raises ex post facto concerns notwithstanding legislative evidence to the contrary. (*Young, supra*, 531 U.S. 250, 261 [121 S.Ct. 727, 734], citing *Hendricks, supra*, 521 U.S. 346, 361 [117 S.Ct. 2072, 2082]; accord, *Nestor, supra*, 363 U.S. 603, 617 [80 S.Ct. 1367, 1376].) This determination requires the "clearest proof" and is not lightly made. (*Young, supra*, 531 U.S. at p. 261 [121 S.Ct. at p. 734]; *Nestor, supra*, 363 U.S. at p. 617 [80 S.Ct. at p. 1376].) The controlling considerations vary depending upon the circumstances of the case.

Specifically, the high court has considered such factors as whether the challenged law imposes an affirmative disability or restraint; whether any such sanction has been historically regarded as punishment; whether the law promotes the traditional aims of punishment (i.e., retribution and deterrence)

through means commonly used in criminal statutes (e.g., imposing culpability for proscribed acts and requiring scienter); whether the law bears a rational connection to legitimate nonpenal aims; and whether it appears excessive in relation to such aims. (*Hendricks, supra*, 521 U.S. 346, 361-363 [117 S.Ct. 2072, 2081-2083], applying *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168-169 [83 S.Ct. 554, 567-578, 9 L.Ed.2d 644]; see *Hudson v. United States* (1997) 522 U.S. 93, 99 [118 S.Ct. 488, 493, 139 L.Ed.2d 450, 162 A.L.R. Fed. 737] [describing the factors as "useful guideposts"]; *United States v. Ward* (1980) 448 U.S. 242, 249 [100 S.Ct. 2636, 2641-2642, 65 L.Ed.2d 742] [discussing one "helpful" factor and finding no punishment].)

■ This court has applied the foregoing principles and rejected ex post facto challenges to laws regulating the public safety risks posed by convicted sex offenders. We have consistently found that such statutes are not punitive in purpose or effect even where they place substantial burdens on persons who committed pre-enactment crimes. Three recent cases illustrate the point.

In *Castellanos, supra*, 21 Cal.4th 785, a convicted sex offender was required to register with local authorities upon his release from prison. Registration was ordered during sentencing on the qualifying crimes, and was based on legislation enacted after they occurred. This court declined to strike the registration requirement, finding no punishment in the ex post facto sense. While separate opinions in the case emphasized different factors in reaching this conclusion, a majority of the court agreed that registration laws had not traditionally been viewed as criminal or penal in nature. (*Castellanos* at pp. 792, 798 (lead opn. of George, C. J.); *id.* at p. 804 (conc. & dis. opn. of Kennard, J.).) A majority of Justices also found that registration helps locate sex offenders who commit new crimes, and that the law is no more onerous than necessary to protect the public from harm—a permissible regulatory goal. (*Castellanos* at pp. 796, 798 (lead opn. of George, C. J.); *id.* at p. 804 (conc. & dis. opn. of Kennard, J.).)

Similarly, in *People v. McVickers* (1992) 4 Cal.4th 81 [13 Cal.Rptr.2d 850, 840 P.2d 955], the sentencing court ordered a convicted sex offender to take an HIV blood test under a postcrime statute allowing positive test results to be used for future sentence enhancement purposes. On review, this court observed that the statute was intended to serve the legitimate nonpenal purpose of preventing the spread of disease and that medical testing had not historically been used as punishment for crime. Also, none of the means employed by the statute appeared excessive or retributive, namely, a minimally intrusive blood test, limited disclosure of test results, and additional punishment upon reoffense. (*Id.* at pp. 87-89.) We therefore held that the

statutory test requirement did not constitute punishment and that its application did not offend ex post facto principles. (*Id.* at p. 90.)

A more onerous measure, the Sexually Violent Predators Act, was upheld in *Hubbart, supra*, 19 Cal.4th 1138. Under this act, mentally disordered sex offenders could be involuntarily committed to a secure treatment facility immediately upon their release from prison based, in part, on violent crimes committed before the law took effect. The law allowed commitment to continue as long as the person remained dangerous, and offered various opportunities to obtain release under appropriate conditions. (*Id.* at pp. 1143-1149.) Applying *Hendricks, supra*, 521 U.S. 346, which upheld a similar Kansas law, this court found that the commitment scheme did not increase punishment for the qualifying crimes or implicate ex post facto concerns. Relevant factors included the state's legitimate interest in protecting the public and treating dangerously ill persons, the historical use of commitment laws for this purpose, and various statutory features ensuring that commitment lasted no longer than necessary to achieve the law's nonpunitive aims. (*Hubbart, supra*, 19 Cal.4th 1138, 1172-1178.)

Ansell implicitly attempts to distinguish the foregoing cases, and suggests that certain factors commonly used to find criminal punishment are present here. He first assumes that the postsentence disabilities imposed on convicted felons under state statutory law are part of the punishment for their crimes. As best we can discern from the conclusory nature of the claim, he contends that the amendment to section 4852.01(d) aggravates punishment because it prevents use of a certificate of rehabilitation, and any pardon that might be based thereon, to obtain relief from these affirmative punitive restraints.

At the outset, we reject the suggestion that absent section 4852.01(d), a certificate of rehabilitation is *necessarily* available to any convicted felon who claims to meet the minimum statutory requirements and is otherwise eligible to apply. As we have explained, the superior court conducts a thorough inquiry into the applicant's conduct and character from the time of the underlying crimes through the time of the certificate of rehabilitation proceeding. (§§ 4852.1-4852.12.) The standards for determining whether rehabilitation has occurred are high. (§§ 4852.05, 4852.13(a); see §§ 4852.11, 4852.13(b).) The decision whether to grant relief based on the evidence is discretionary in nature. (*People v. Lockwood* (1998) 66 Cal.App.4th 222, 227-229 [77 Cal.Rptr.2d 769]; see § 4852.13(a), as amended by Stats. 1996, ch. 129, § 2, eff. July 8, 1996 [clarifying that a certificate of rehabilitation "may" issue upon the requisite showing of reform].) Contrary to what Ansell seems to imply, there is no circumstance under which the statutory scheme

requires or guarantees issuance of a certificate of rehabilitation by the superior court.

Ansell also mischaracterizes those postsentence consequences of a felony conviction that might be ameliorated or removed by a certificate of rehabilitation or an ensuing pardon. In a long line of decisions, the United States Supreme Court has upheld laws restricting the rights and conduct of convicted felons after sentence is served, even where fundamental interests are at stake. (*Lewis v. United States* (1980) 445 U.S. 55, 60-67 [100 S.Ct. 915, 918-921, 63 L.Ed.2d 198] (*Lewis*) [applying a federal firearm ban to a convicted felon whose qualifying conviction was obtained in violation of the constitutional right to counsel]; *Richardson v. Ramirez, supra*, 418 U.S. 24, 41-56 [94 S.Ct. 2655, 2665-2672] [upholding state laws permanently depriving convicted felons of the right to vote]; *De Veau v. Braisted* (1960) 363 U.S. 144, 151-160 [80 S.Ct. 1146, 1150-1154, 4 L.Ed.2d 1109] (*De Veau*) (lead opn. of Frankfurter, J.) [enforcing a state statute prohibiting convicted felons from holding office in labor organizations]; *Hawker v. New York* (1898) 170 U.S. 189, 192-200 [18 S.Ct. 573, 575-578, 42 L.Ed. 1002] (*Hawker*) [applying a state statute barring convicted felons from practicing medicine].)

The foregoing disabilities are "civil" notwithstanding the use of criminal sanctions to ensure their enforcement. (*Lewis, supra*, 445 U.S. 55, 67 [100 S.Ct. 915, 922]; see *Hawker, supra*, 170 U.S. 189, 190, 196-197 [18 S.Ct. 573, 576-577].) The same laws also do not involve "punishment" when subjected to ex post facto scrutiny. (*De Veau, supra*, 363 U.S. 144, 160 [80 S.Ct 1146, 1155] (lead opn. of Frankfurter, J.); *Hawker, supra*, 170 U.S. at pp. 191, 196-197 [18 S.Ct. at pp. 574, 576].) In reaching these conclusions, the high court has emphasized that the restrictions are imposed, not as punishment for past crimes, but as a "relevant incident" to some other present regulatory purpose. (*De Veau, supra*, 363 U.S. at p. 160 [80 S.Ct. at p. 1155] (lead opn. of Frankfurter, J.); see, e.g., *Lewis, supra*, 445 U.S. at p. 66 [100 S.Ct. at p. 921] [Congress could reasonably conclude that firearms are dangerous in the hands of convicted felons]; *Hawker, supra*, 170 U.S. at pp. 196-197 [18 S.Ct. at p. 576] [legislature could reasonably conclude that convicted felons are unfit to practice medicine].)[23]

The same principles define the postsentence disabilities experienced by convicted felons under California law. These statutes serve vital public

---

[23]The vocational and other civil disabilities upheld in *Hawker, supra*, 170 U.S. 189, and later cases, are distinguishable from the unusual penal laws invalidated in *Cummings v. Missouri* (1867) 71 U.S. (4 Wall.) 277 [18 L.Ed. 356] (*Cummings*), and *Ex Parte Garland* (1867) 71 U.S. (4 Wall.) 333 [18 L.Ed. 366] (*Garland*).

In *Cummings*, a post-Civil-War amendment to the Missouri Constitution required public officeholders and members of numerous vocations and professions to deny under oath that they had given aid, comfort, or "sympathy" to the Confederate cause or to any of its

interests, avoid criminal punishment, and otherwise raise no ex post facto concerns. (See, e.g., *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 784-786 [72 Cal.Rptr.2d 624, 952 P.2d 641] [licensing rules and disciplinary proceedings under the Business and Professions Code are not criminal or penal, and instead promote vocational fitness and competence], 787 [same characterization of vocational disqualifications based on felony convictions]; *Castellanos, supra*, 21 Cal.4th 785, 796 (lead opn. of George, C. J.) [sex offender registration requirement protects the public from harm and does not involve criminal punishment under ex post facto principles]; *id.* at pp. 804-805 (conc. & dis. opn. of Kennard, J.) [same]; *People v. Castro* (1985) 38 Cal.3d 301, 314 [211 Cal.Rptr. 719, 696 P.2d 111] (lead opn. of Kaus, J.) [impeachment with a prior felony conviction provides the present trier of fact with relevant information concerning the witness's character and credibility]; *Rubio v. Superior Court* (1979) 24 Cal.3d 93, 101 [154 Cal.Rptr. 734, 593 P.2d 595] [exclusion of convicted felons from jury service promotes the state's legitimate interest in assuring an impartial verdict]; *People v. King* (1978) 22 Cal.3d 12, 21 [148 Cal.Rptr. 409, 582 P.2d 1000] [firearm prohibition promotes public safety and rationally assumes the danger is greater where such weapons are possessed by convicted felons].)

Hence, the statutory disabilities about which Ansell complains have not historically been regarded as criminal or penal under ex post facto principles.

---

supporters. (*Cummings, supra,* 71 U.S. (4 Wall.) 277, 317 [18 L.Ed. 356, 361].) On the one hand, false swearing of the oath was a crime punishable by imprisonment. On the other hand, failure to take the oath essentially served as an admission of guilt to the proscribed acts, and was punishable both by imprisonment and by permanent exclusion from the specified offices and vocations. Declining to apply the law to a clergyman who had not taken the oath as required, *Cummings* held that the lifetime vocational ban amounted to ex post facto punishment for conduct which was not criminal when it occurred, or which had not previously been sanctioned in the same manner. The high court emphasized that many of the proscribed acts *"have no possible relation to [the oath takers'] fitness for th[e various] pursuits and professions. . . .* The oath could not, therefore, have been required as a means of ascertaining whether parties were qualified or not for their respective callings or the trusts with which they were charged." (*Id.* at pp. 319-320 [18 L.Ed. at pp. 361-362], italics added.) Rather, the oath was exacted "because *it was thought that the several acts deserved punishment,* and that for many of them there was no way to inflict punishment except by depriving the parties, who had committed them, of some of the rights and privileges of the citizen." (*Id.* at p. 320 [18 L.Ed. at p. 362], italics added.)

Similarly, in *Garland, supra,* 71 U.S. (4 Wall.) 333, 376 [18 L.Ed. 366, 369], Congress enacted a statute permanently barring attorneys from practicing law in federal court unless they swore under oath that they had not assisted or "encourage[d]" the Confederacy during the Civil War. *Garland* followed *Cummings,* and held that the statute could not be applied to an attorney who had not taken the oath due to his wartime political activities. Because it resulted in perpetual exclusion from the bar for vindictive reasons unrelated to the lawyer's professional fitness and qualifications, the law inflicted new and greater criminal punishment in violation of ex post facto principles. (*Garland* at pp. 377-380 [18 L.Ed. at pp. 369-371].)

To the extent some convicted sex offenders are barred from using certificates of rehabilitation to remove or ease these civil restraints, the amendment to section 4852.01(d) thus does not inflict punishment for the underlying crimes. The statute is not punitive simply because it denies the opportunity to obtain relief from other *nonpunitive* laws. We find no ex post facto violation on this ground.

Ansell next suggests that the amendment to section 4852.01(d) is vindictive and far more burdensome than necessary to achieve its nonpenal aims. For reasons he does not explain, Ansell assumes that a certificate of rehabilitation offers the sole means by which convicted sex offenders can seek and obtain a gubernatorial pardon. By denying access to the certificate of rehabilitation procedure, he insists, the amended statute ensures that the affected group has no chance of receiving a pardon even where rehabilitation under section 4852.01 et seq. may have occurred. We find no statutory support for this claim.

A certificate of rehabilitation constitutes an application for a pardon when received by the Governor. (§ 4852.16.) Ansell is correct that the amendment to section 4852.01(d) withholds this automatic application provision from sex offenders convicted of the specified crimes. According to the legislative history discussed earlier, the change affects those individuals who are least likely to obtain certificates of rehabilitation in the superior court, and who are most likely to waste public resources attempting to obtain such relief.

However, nothing prevents convicted sex offenders like Ansell from pursuing clemency outside the certificate of rehabilitation scheme. (See § 4852.19.) Under the alternative procedure set forth in section 4800 et seq., convicted felons—including sex offenders covered by section 4852.01(d)— may appeal directly to the Governor for a pardon and for relief from the civil disabilities we have described. Like the certificate of rehabilitation scheme in section 4852.01 et seq., the direct application procedure contemplates a thorough investigation of all pardon candidates, including any rehabilitative steps taken after sentence is served. (§§ 4802-4803, 4812-4813; see *ante,* fn. 11.)

Indeed, the Legislature has acknowledged the Governor's "right to pardon" convicted sex offenders "[n]otwithstanding" their ineligibility for certificates of rehabilitation under section 4852.01(d). (§ 4852.01(e).) As suggested by section 4852.01(e) and reflected in section 4800 et seq., no change has been made in the standards used to investigate and process pardon applications not submitted in certificate of rehabilitation form. (See *ante,* fn. 18.)

We recognize that a certificate of rehabilitation also serves as a judicial recommendation for a pardon (§ 4852.13(a)), and that no similar provision appears in section 4800 et seq. However, regardless of which statutory application procedure is used, and notwithstanding any recommendation by the superior court, the pardon decision is discretionary, and rests ultimately with the Governor. (Cal. Const., art. V, § 8, subd. (a); see Brown, *The Quality of Mercy* (1993) 40 UCLA L.Rev. 327, 328-332.) The amendment to section 4852.01(d) effects no fundamental, punitive change in the opportunity for executive mercy and clemency available to convicted sex offenders.

Finally, Ansell contends the amended statute constitutes an ex post facto law under *Sovereign, supra,* 144 Cal.App.3d 143. In his view, *Sovereign* properly concluded that unfavorable changes in the certificate of rehabilitation scheme are punitive and cannot be applied to persons who commit pre-amendment crimes. However, we reject *Sovereign*'s reasoning and result.

In *Sovereign,* an attorney (petitioner) was convicted of grand theft, imprisoned, and then paroled. Less than three and one-half years after he was released from prison, and slightly more than two years after he was discharged from parole, petitioner sought and received a certificate of rehabilitation. In granting relief, the superior court apparently relied on the minimum statutory period of rehabilitation in existence when petitioner left prison. However, eight months before the petition was filed, an amendment to section 4852.03 lengthened the applicable period of rehabilitation by 21 months, and thereby postponed the earliest time at which a certificate of rehabilitation could be sought. Relying on this amendment, the People claimed the certificate of rehabilitation was void, and moved to vacate the order. The superior court denied the motion. (*Sovereign, supra,* 144 Cal.App.3d at pp. 145-147.)

Affirming the judgment, the Court of Appeal held in *Sovereign* that the new, longer rehabilitation requirement of section 4852.03 could not, consistent with ex post facto guarantees, be used to calculate petitioner's eligibility for a certificate. The court started from the premise that the postsentence disabilities experienced by convicted felons are punitive, including, in petitioner's case, loss of his law license. (*Sovereign, supra,* 144 Cal.App.3d at pp. 147-149.) The court reasoned that because these statutory restrictions inflict punishment until a certificate of rehabilitation and/or pardon is obtained, "then surely [an amendment to section 4852.03 increasing the period of rehabilitation and] prolonging the time that ex-prisoners remain subject to these penalties constitutes punishment, as well." (*Id.* at p. 154.)

*Sovereign*'s analysis is flawed in several respects. First, the court characterized ex post facto violations in terms of any statute that retroactively

" ' "alter[s] the situation of the accused to his disadvantage." ' " (*Sovereign, supra*, 144 Cal.App.3d at p. 150.) The United States Supreme Court has since clarified in *Collins, supra*, 497 U.S. 37, 47-51 [110 S.Ct. 2715, 2721-2723], that such an ambiguous test expands the ex post facto doctrine beyond its original meaning, and is inconsistent with *Calder, supra*, 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648, 650] (opn. of Chase, J.). (See *ante*, fn. 22.) Although *Sovereign* did not have the benefit of *Collins* and its progeny, this subsequent authority undermines the conceptual foundation on which *Sovereign* was based.

Second, both before and after *Sovereign* was decided, punishment for ex post facto purposes has depended on whether a legislative intent to punish is manifest, and whether the law is actually punitive in nature. High court cases have long based the latter determination on, among other things, whether the challenged sanction has historically been regarded as punishment, and whether it bears a rational connection to the law's apparent nonpenal purpose. (E.g., *Nestor, supra*, 363 U.S. 603, 617 [80 S.Ct. 1367, 1376]; *De Veau, supra*, 363 U.S. 144, 160 [80 S.Ct. 1146, 1155] (lead opn. of Frankfurter, J.); see *United States v. Ward, supra*, 448 U.S. 242, 248-249 [100 S.Ct. 2636, 2641]; *Kennedy v. Mendoza-Martinez, supra*, 372 U.S. 144, 168-169 [83 S.Ct. 554, 568].) However, *Sovereign, supra*, 144 Cal.App.3d 143, ignored these principles and authorities. In so doing, *Sovereign* overlooked the obvious remedial effect of increasing the period of rehabilitation in section 4852.03—to ensure material improvement in the petitioner's conduct and character over a meaningful and sustained length of time. (See § 4852.05.)

Third, *Sovereign, supra*, 144 Cal.App.3d 143, failed to consider case law in existence at the time characterizing the disabilities imposed on convicted felons as legitimate regulatory measures. These federal and state decisions have long made clear that the restrictions which *Sovereign* erroneously assumed are penal have not traditionally been viewed in this manner. (E.g., *De Veau, supra*, 363 U.S. 144, 160 [80 S.Ct. 1146, 1155] (lead opn. of Frankfurter, J.); *Hawker, supra*, 170 U.S. 189, 196-197 [18 S.Ct. 573, 576]; *Hughes v. Board of Architectural Examiners, supra*, 17 Cal.4th 763, 784-787, and cases cited; *Rubio v. Superior Court, supra*, 24 Cal.3d 93, 101; *People v. King, supra*, 22 Cal.3d 12, 21.) Thus, contrary to the reasoning of *Sovereign, supra*, 144 Cal.App.3d at page 154, the amendment to section 4852.03 did not prolong punishment insofar as it "prolong[ed] the time" that convicted felons "remain subject to" these laws.

Fourth, and in a related vein, *Sovereign, supra*, 144 Cal.App.3d 143, 153-154, relied upon *Cummings, supra*, 71 U.S. (4 Wall.) 277, and *Garland,*

*supra*, 71 U.S. (4 Wall.) 333, which are inapposite. There, irrevocable and sweeping vocational disqualifications were imposed in the form of loyalty oaths upon persons who had been sympathetic to the Confederacy during the Civil War. These postwar laws exacted retribution for political acts which, in large part, were not criminal when they occurred, and which bore no relationship to the person's fitness to practice the vocations in question. (See *ante*, fn. 23.) Hence, the "novel" restraints invalidated on ex post facto grounds in *Cummings* and *Garland* "were really criminal penalties for which civil form was a disguise." (*Harisiades v. Shaughnessy* (1952) 342 U.S. 580, 595 [72 S.Ct. 512, 522, 96 L.Ed. 586].) Such is not the case with the vocational and other disabilities imposed on convicted felons under state statutory law. The court in *Sovereign, supra*, 144 Cal.App.3d 143, erred insofar as it assumed the contrary was true.

Thus, notwithstanding *Sovereign*, the amendment to section 4852.01(d) does not impose punishment or otherwise implicate ex post facto concerns. We decline to invalidate this provision insofar as it withholds the certificate of rehabilitation procedure in section 4852.01 et seq. from convicted sex offenders who, like Ansell, committed their crimes prior to the amendment's effective date. The decision in *Sovereign v. People, supra*, 144 Cal.App.3d 143, is disapproved to the extent it is inconsistent with this view.

## IV. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.